UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE MARKETING ALLIANCE, INC., <br><br> Plaintiff, <br><br> v. <br><br> FIRST AMERICAN INSURANCE UNDERWRITERS, INC., <br><br> Defendant. | CIVIL ACTION NO: 05-12046REK |

## AFFIDAVIT OF KENNETH SHAPIRO

I, Kenneth Shapiro, being duly sworn, do hereby depose and state as follows:

1. I am the President of First American Insurance Underwriters, Inc. ("FAIU"), the Defendant in the above-captioned action.

2. I make this Affidavit based upon my review of the Verified Complaint filed by The Marketing Alliance, Inc. ("TMA"), as well as upon my own personal knowledge, information and belief, and so far as facts are stated, upon information and belief, I believe them to be true.

### The First American and TMA Companies

3. FAIU was first organized on December 18, 2000. Its Chairman, Allan Gersten, has been in the retail and wholesale insurance business since 1980, when he founded Gersten Financial Services, a retail insurance and securities firm.

4. By 1994, Gersten Financial grew into a (wholesale) life brokerage business. FAIU was then formed in 2000 to become the vehicle through which the rapidly expanding life brokerage business would be conducted. FAIU thus acts as a brokerage general agent, brokering insurance to agents who then sell this insurance to their individual clients.

5. In my capacity as President, I manage the day-to-day operations. FAIU currently works with approximately 50 insurance companies nationwide, and does business in all 50 states.

6. On or about April 19, 2001, FAIU became a member of TMA's organization. The membership was free. FAIU remained a member for approximately four years. FAIU terminated the relationship as a result of TMA changing its business model. That is, TMA's distributor compensation structure changed throughout FAIU's membership to a point where it was no longer advantageous for FAIU to remain a member.

7. In contrast to most of the TMA member agencies, FAIU is comparatively larger. Owing to its longstanding reputation through Gersten Financial and its Chairman, Allan Gersten, dating back to 1980 and before, Gersten Financial had obtained, and maintained, relationships with far more insurance carriers nationwide than TMA could offer. Despite TMA's self-proclaimed niche, FAIU actually enjoys a comparatively greater number of impaired risk and specialty outlets than does TMA, and it compensates its participating producers and agencies differently than does TMA. As an aggregator of business in its own right, FAIU fully understands the TMA business model, first-hand, as a result of being a former member.

8. While a member of TMA, I met Greg Schwabe. Over the course of our four year membership in TMA, Mr. Schwabe would periodically visit FAIU as a measure of TMA-member goodwill, and openly discuss various available insurance products. As said, FAIU ultimately terminated its membership in TMA owing to the incompatible business models. In particular, FAIU was able to get better contracts, and higher compensation levels, outside TMA, with the very same companies with whom FAIU already did business.

1160347v1

9. Even despite terminating the TMA relationship, FAIU submitted yet a few additional cases to TMA. Since terminating, I, or employees of FAIU, had occasion to speak with TMA or Greg Schwabe over case statuses, including various details and nuances involved in these cases.

10. In mid-July of 2005, I asked Greg Schwabe whether he had an interest in the type and model of business that FAIU was pursuing. As a result of those discussions, Greg Schwabe accepted employment with FAIU as of September 12, 2005.

### The TMA Verified Complaint

11. Having reviewed the Verified Complaint, I am fully familiar with its allegations. In its introduction, TMA alleges that FAIU "conspired with [Schwabe] for [him] to leave TMA and, on behalf of First American, to steal the confidential and proprietary information of TMA and to use that data against TMA in the highly competitive insurance business." TMA goes on to allege in its introduction that Schwabe, "provided TMA's data to First American" while still employed by TMA. These allegations are completely false and unsupported. At no time did FAIU either "steal" or "receive" any confidential or proprietary information of TMA. FAIU did not conspire with Schwabe, did not steal, did not receive, did not access, and absolutely did not review any of the TMA data which is alleged.

12. Still in the introduction, TMA alleges that "First American appears to have copied over 650 files on that computer." Again, at no time did FAIU copy, access or review any files on Mr. Schwabe's computer. In point of fact, FAIU did not copy files, did not access files, and absolutely did not review the files alleged to be on his computer. Further, until receiving notice that same morning from TMA, FAIU did not even know, nor was it made aware, that this desktop computer was TMA's and not Mr. Schwabe's himself.

3

13.     Mr. Schwabe asked an FAIU employee for help to turn on the computer because it was said that he wanted to retrieve his wife's draft children's book manuscript from this computer. It was explained to this FAIU employee that the computer had somehow malfunctioned. Only for a period of a couple of minutes did this FAIU employee attempt to assist Mr. Schwabe to get the computer to work or even turn on. He was unable to do so. FAIU did not know of any such files, and had no interest in reviewing them.

14.     Once Mr. Gersten apprised me of the notice he received from TMA, that the computer was considered proprietary by TMA, I instructed the FAIU employee to leave it alone. FAIU wanted nothing more to do with the computer and freely returned it without objection.

15.     Based upon my review of TMA's Verified Complaint, it is clear to me that TMA believes that files on Mr. Schwabe's computer somehow contain confidential and proprietary information concerning the so-called TMA business model. It is further clear that TMA considers its business model to be somehow unique. In point of fact, there is almost nothing unique about the TMA business model. What is not readily obtainable from its own website, is clearly obtainable once an agency becomes a member - - and membership is free. The information contained on its website concerning its distributor relationships, its companies, the forms it uses, and all of its insurance-related links is available and immediately accessible to anyone accessing the site, including the general public.

16.     TMA is an aggregator of insurance carriers. The information and data that TMA markets is almost entirely, if not all, public information. As a member of TMA for four years, FAIU observed the TMA business model, understood it and did not agree with it. Indeed, there are numerous companies doing business much the same way nationwide. Indeed, the publication, "Broker World," identifies approximately 20 companies, such as LifeMark Partners and

Brokerage Resources of America which operate as aggregators like TMA. The list in this publication is by no means exhaustive, but identifies companies whose main focus is to aggregate; in other words, stand-alone national marketing operations.

## The Relief Sought

17. TMA seeks injunctive relief against FAIU "from using the misappropriated data, and from doing business with the wholesalers which comprise the TMA distributor network." As stated above, FAIU did not "misappropriate" any data. However, FAIU and/or Allan Gersten already does business with many of the wholesalers which comprise the TMA distributor network, and they have done so in the ordinary course of their business outside FAIU's membership in TMA for over 10 years. In point of fact, there are numerous companies like FAIU that are not just stand-alone marketing operations like TMA, but rather they offer special buying and aggregation offers to other operations.

18. In its Verified Complaint, TMA claims to service a "unique niche market…on hard-to-place insurance risks." (Verified Complaint, ¶12.) This niche market, however, is by no means unique to TMA. FAIU and Gersten Financial have been placing and servicing impaired risk and specialty cases just like TMA, but for years prior to TMA's existence.

19. Paragraph 46 of TMA's Verified Complaint openly suggests that Schwabe, whether intentional or not, should not be able to use his years of experience, his valued reputation and general know-how in the industry to assess and determine basic insurance information, including "which products to emphasize" and "how much compensation to pay for those products", at any other agency, including FAIU, whether a competitor or not. TMA argues, therefore, that Schwabe should not be allowed to work in the industry anywhere other than at TMA - - much like an indentured servant.

1160347v1

20. Paragraph 47 of the Verified Complaint goes on to allege that Schwabe and FAIU will "develop a competitive business". Notwithstanding the lack of any scheme, as alleged, or the fact that nothing has been misappropriated whatsoever, FAIU is already a competitor as a result of its years of experience as both an established agency and aggregator of business. TMA boldly asserts that its "research" has never been done. Actually, whatever research exists at TMA is obtainable through the carriers themselves, which is all public information. TMA simply takes an insurance carrier's data, then posts it to the TMA website and calls that data its own. TMA seeks to restrict Greg Schwabe's years of experience and valued reputation in the industry, but not any data or proprietary information because there is none to speak of that is either confidential or proprietary.

21. If TMA were granted the relief it seeks, FAIU would be irreparably harmed. As set forth above, FAIU does business with many of the same carriers and agencies - - plus others, and it services the same niche market. In a services industry as this, to restrict the business in which FAIU has always engaged, and to further restrict industry relationships upon which it relies, would be to severely and substantially hinder FAIU's business and thereby cause irreparable harm. Whereas FAIU has not taken, received or reviewed any of the so-called proprietary data on any of the alleged computer files, the resulting harm to FAIU far outweighs any harm to TMA.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 17th DAY OF OCTOBER, 2005.

_____
Kenneth Shapiro

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE MARKETING ALLIANCE INC., <br><br> Plaintiff, <br> v. <br><br> FIRST AMERICAN INSURANCE UNDERWRITERS, INC. <br><br> Defendant. | CIVIL ACTION NO. <br> 05-12046REK |

## AFFIDAVIT OF STEVEN R. KURSH, PH.D, CSDP

I, Steven R. Kursh, being duly sworn, do hereby depose and state as follows:

1. My name is Steven R. Kursh. I am competent to testify as to the matters asserted of which I am familiar. I have been employed by Northeastern University in Boston, Massachusetts since 1994 and presently hold the position of Executive Professor. I have also developed and taught courses at Harvard University, at the University of Pennsylvania, and in Continuing Professional Education programs.

2. I have more than twenty years of experience in the computer and high technology fields, and I am presently affiliated with the Cutter Consortium, an International Information Technology firm. My consulting clients include companies ranging from startup ventures to publicly-traded firms including ACS (Affiliated Computer Services), IBM, AT&T, IDT, and FAST Search and Technology.

3. I graduated from Boston College with honors and with the Scholar of the College distinction. I earned my Ph.D from the University of Pennsylvania and I am certified by the

Computer Society of the Institute of Electrical and Electronics Engineers (IEEE) as a Computer Software Development Professional (CSDP).

4. I am the author of academic and professional articles and a book published by Financial Times Prentice-Hall. I have recently been named a Fulbright Scholar.

5. I have reviewed the Plaintiff's Memorandum of Law in Support of Its Motion For A Temporary Restraining Order and Preliminary Injunction, submitted to the United States District Court, District of Connecticut, dated October 11, 2005; the Affidavit of Jeffrey Trombly dated October 11, 2005; the Affidavit of Nicholas Kleniatis, an employee of First American Insurance Underwriters, Inc., ("FAIU") dated October 17, 2005; and the Affidavit of Greg Schwabe dated October 17, 2005. I also spoke with Mr. Schwabe on October 15, 2005 and Mr. Kleniatis on October 17, 2005.

## CONCLUSIONS

6. Based upon my research, training, and experience, I have formed the following preliminary expert opinions:

7. Mr. Trombly's findings that 650 files were "touched" and that the name on the hard drive changed does *not* necessitate that files were copied or even viewed. His statements regarding "touching," as implicitly constituting copying are misleading to the court.

8. It is important to note the distinction between files being merely "touched" and files being copied. Indeed, Mr. Trombly should have noted in his affidavit that there is an enormous difference between a computer simply "touching" files and someone copying files from one computer to another computer, particularly in a time span of less than two minutes.

9. Similarly, Mr. Trombly should have noted the fact that a hard drive was moved from one computer to another indicates only that it was moved, but such does not address the individual's reason for doing so.

10. Mr. Trombly fails to note in his affidavit that many of the files that were "touched" were likely associated with the manuscript for a children's book that Mr. Schwabe's wife had been writing.

11. Mr. Trombly, furthermore, fails to provide any evidence that the files "touched" are, indeed, even the files that plaintiff's counsel asserts contain the alleged confidential information and trade secrets.

12. Mr. Trombly should have provided a detailed listing of *all* of the files that were "touched" including the file name, the subdirectory location of each file with files listed by subdirectory, file creation date/time, file last access date/time, file last written to date/time, the owner, the author, and the file sizes in bytes.

13. The hard drive in the possession of plaintiff's counsel or Mr. Trombly should immediately be given to a neutral third party for examination. Additional actions by Trombly could potentially alter the hard drive and risk deletion of the manuscript and changes to other files.

14. A neutral third party expert should be retained to make a backup of the FAIU computer and to search the backup to determine if the files identified by plaintiff's counsel as having the alleged confidential information and trade secrets were copied. Additionally, the backup could be searched for the specifically identified trade secrets and confidential information.

SIGNED UNDER THE PAINS AND PENALITIES OF PERJURY THIS 17TH DAY OF OCTOBER, 2005

*Steven R. Kursh*

Steven R. Kursh, Ph.D., CSDP

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE MARKETING ALLIANCE, INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> FIRST AMERICAN INSURANCE ) <br> UNDERWRITERS, INC., ) <br> ) <br> Defendant. ) | CIVIL ACTION NO: 05-12046REK |

## AFFIDAVIT OF NICHOLAS KLENIATIS

I, Nicholas Kleniatis, under oath do depose and state upon personal knowledge the following:

1. I am an employee at First American Insurance Underwriters, Inc. ("FAIU") where my duties involve creating illustrations and marketing. From time to time, I also assist others at FAIU with information technology problems. I am not the IT director, as we have an outside vendor for such services.

2. On or about Monday, September 26, 2005, Gregory Schwabe presented me with what appeared to be a home desktop computer and asked me to attempt to turn it on because it was not working. Other than asking me to turn it on, he made no other comments.

3. I attempted to turn the computer on. I clicked the power button but received only a blank screen.

4. I then opened the case by pressing two buttons. I took out the hard drive from the desktop and inserted it into an FAIU office computer (a generic machine named GFI 03N1). The computer recognized that a hard drive was present. Before I could do anything further, I was

told by Kenneth Shapiro, the President of FAIU, to immediately stop work on the computer. I did so and brought it upstairs to be picked up.

5. At no point was I able to get the computer to work or to access the hard drive. The data on the hard drive was not viewed, transferred, interfered with, copied or tampered with in any fashion.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 17 DAY OF October, 2005.

_____
Nicholas Klematis

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| THE MARKETING ALLIANCE, INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> FIRST AMERICAN INSURANCE ) <br> UNDERWRITERS, INC., ) <br> ) <br> Defendant. ) | CIVIL ACTION NO: 05-12046REK |

### AFFIDAVIT OF DENISE SCHWABE

I, Denise Schwabe, under oath do depose and state upon personal knowledge the following:

1. I am the author of two children's books which I kept and viewed at the desktop computer of my husband, Greg Schwabe, which he would use, from time to time, for his work at The Marketing Alliance, Inc. ("TMA"). I believe the manuscripts on the desktop may have been entitled CP1.

2. One manuscript is entitled "The Legend of the Christmas Penguin" (hence, CP1) and the other manuscript is entitled "The Right Gift".

3. When I learned that my husband would be leaving TMA and returning the desktop to TMA, I was very concerned about losing the two children's book manuscripts. I had invested a significant amount of time, effort and energy in these books and they were stored only on the desktop.

4. Specifically, the manuscripts were saved in the "My Documents" folder on the Hard Drive.

1160503v1

5. I would read the manuscripts off of the desktop computer when it was functioning.

6. During the summer of 2005, the computer was beginning to malfunction and operate slowly. It would only operate in safe mode, but that would not enable me to work with the documents. Since the desktop could only operate in safe mode, I was unable to print copies of the manuscripts.

7. Retrieving the manuscripts was especially important to me because I needed to get the manuscripts to my publisher and needed to preserve the fruits of my efforts. I also needed to do a "word count" for my publisher.

8. I then asked my husband, Greg Schwabe, to recover the manuscripts from the desktop and reminded him of the importance of the manuscripts.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 17 DAY OF October, 2005.

Denise Schwabe

2

11605030